UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Kerry Jerome,
        Plaintiff,

      v.                                     Civil Action No. 2:08-CV-98

Michael J. Astrue,
Commissioner of Social Security,
        Defendant.

## OPINION AND ORDER
(Docs. 13 and 14)

Claimant Kerry Jerome brings this action pursuant to 42 U.S.C. § 405(g) of the

Social Security Act, seeking review of the decision of the Commissioner of Social

Security ("Commissioner") denying his applications for disability insurance benefits

("DIB") and Supplemental Security Income ("SSI").  Pending before the Court are

Jerome's Motion seeking an order reversing the Commissioner's decision (Doc. 13), and

the Commissioner's Motion seeking an order affirming the same (Doc. 14).

For the reasons explained below, the Court GRANTS Jerome's Motion (Doc. 13),

DENIES the Motion of the Commissioner (Doc. 14), and REMANDS the matter for

another hearing before the Commissioner.

## Claimant's Background/Procedural History

Jerome was born on October 7, 1957, and has a high school education.

(Administrative Record ("AR") 34, 45.)  He has work experience as a truck driver, a dry-

wall applicator, an insulation installer, a construction worker (including iron and mason

work), a maintenance worker, a lodging-facilities attendant, a house painter, a car detailer, and a home attendant. (AR 20, 45, 94, 130.) He stopped working full-time in June 2006. (AR 27, 30.) On or around October 25, 2006, Jerome filed applications for DIB and SSI. (AR 77-88.) Jerome claims he was unable to work due to chronic back pain and chronic obstructive pulmonary disease from June 23, 2006, the alleged disability onset date, through September 30, 2007, his date last insured ("DLI"), and thereafter, through the date of the administrative decision. (AR 77-88, 93, 108-09, 147-48.)

Jerome's applications were denied initially and upon further reconsideration. (AR 34-46.) He thereupon timely requested an administrative hearing, which occurred by video on November 8, 2007. (AR 23-33.) On November 29, 2007, the Administrative Law Judge ("ALJ") issued a decision determining that Jerome was not under a disability, as defined in the Social Security Act, from his alleged onset date through the date of the decision. (AR 11-22.) The Decision Review Board selected Jerome's claim for review, and on March 3, 2008, the Board affirmed the ALJ's decision. (AR 3-6, 11.)

On May 7, 2008, Jerome filed a Complaint against the Commissioner, initiating this action.

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is so engaged, then he is not considered disabled. If the claimant is not engaged in substantial gainful

activity, step two requires the ALJ to determine whether the claimant has a severe

impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant

has a severe impairment, the third step requires the ALJ to make a determination as to

whether the claimant's impairment meets or equals an impairment listed in 20 C.F.R. Part

404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is

considered presumptively disabled if the impairment meets or equals a listed impairment.

*See Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). If the claimant is not

presumptively disabled, the fourth step requires the ALJ to consider whether the

claimant's "residual functional capacity" ("RFC") precludes the performance of his or

her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). The fifth and final step

requires the ALJ to determine whether the claimant can do "any other work." 20 C.F.R.

§§ 404.1520(g), 416.920(g).

 The claimant bears the burden of proving his case at steps one through four; and at

step five, the burden shifts to the Commissioner to "'show there is other gainful work in

the national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d

at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)). As noted above, at

step four, the claimant has the burden of showing that he cannot perform past relevant

work. *Ferraris v. Heckler*, 728 F.2d at 584. Once the claimant has met that burden, the

ALJ may deny benefits only by showing, with specific reference to medical evidence,

that the claimant is able to perform some type of less demanding work. *See White v.

Sec'y of Health & Human Servs.*, 910 F.2d 64, 65 (2d Cir. 1990). To make this

determination, the ALJ considers the claimant's residual functional capacity, age,

education, past work experience, and transferability of skills, to determine whether the

claimant can perform work alternatives.  20 C.F.R. §§ 404.1520(g), 416.920(g); *see also*

*Willis v. Comm'r of Soc. Sec.*, No. 6:05-CV-611, 2008 WL 795004, at **2-3 (N.D.N.Y.

Mar. 24, 2008); *New York v. Sullivan*, 906 F.2d 910, 913 (2d Cir. 1990).

Employing this five-step analysis, the ALJ in this case determined that Jerome was

not disabled, as that term is defined in the Social Security Act, from June 23, 2006, the

alleged disability onset date, through the date of the decision.  (AR 15.)  At step one, the

ALJ found that Jerome had not engaged in substantial gainful activity since the alleged

onset date.  (AR 17.)  At step two, the ALJ found that Jerome had severe impairments of

obstructive airway disease, back pain secondary to herniated disc, and methadone

dependence manifested by depression.  (*Id.*)  The ALJ based this finding on "the

objectively documented clinical signs and findings and the treating physical notes and

opinions described in the medical evidence record."  (*Id.*)  Next, at step three, after

considering the Listings for lumbar spinal stenosis, chronic restrictive ventilatory disease,

affective disorder, and substance addition disorder (Listings 3.02B, 12.04, and 12.09,

respectively), the ALJ determined that Jerome did not have an impairment or

combination of impairments meeting or medically equaling one of the listed impairments

in 20 C.F.R. Part 404, Subpart P, Appendix 1, prior to expiration of insured status.  (*Id.*)

Moving to step four, the ALJ considered Jerome's RFC, and concluded that

Jerome could perform "light work except [that he] can only occasionally climb ladders,

ropes or scaffolds and [c]an only occasionally stoop, crouch, kneel and crawl."  (AR 18.)

Applying this conclusion, the ALJ found that Jerome was unable to perform any past

relevant work, including jobs as a home attendant, a painter, a lodging facilities attendant, a construction worker, an installer, an insulation worker, and a dry-wall applicator, all of which involve "medium exertional work," according to the Dictionary of Occupational Titles. (AR 20.)

The ALJ's conclusion that Jerome had the RFC to perform light work appears to have been supported by the ALJ's findings that: (1) Jerome's statements concerning the intensity, persistence, and limiting effects of the symptoms of his impairments were "not entirely credible," given that Jerome was able to perform crossword puzzles, cook, and perform household chores for significantly relevant periods of time, and given that Jerome did not have difficultly carrying out self-care and social activities; and (2) the objective medical evidence did not support Jerome's allegations of being totally and continuously disabled. (AR 19-20.) Regarding the medical evidence, the ALJ noted that "radiological evidence documents evidence of degenerative disc disease at L5-S1 with small central disc herniation." (AR 19.) This finding was apparently based on either a June 1996 (AR 177) or a July 1998 (AR 169, 176) MRI of Jerome's spine, although there is no citation to the record. Oddly, despite noting the 1996/1998 MRI, the ALJ decision makes no mention of a much more recent August 2002 MRI of Jerome's spine, which was also part of the record. (AR 367.)

Without citing to the record, the ALJ decision notes that "[m]edical examinations have shown stiff ambulation, back pain that inhibits the ability to engage in work related activity after only a short time, limited range of motion and minimal bending." (AR 19.) Regarding medical opinion evidence, the ALJ considered the March 2007 assessment of

state agency medical consultant Dr. Cynthia Short, as well as the 2007 Medical Source Statement of Jerome's treating physician, Dr. Timothy Tanner. (AR 20.) The ALJ gave "significant weight" to Dr. Short's opinion, but found that Dr. Tanner's opinion was "not sufficiently credible to be given significant weight," given "Dr. Tanner's failure to relate [his opinion] to objective medical signs and findings." (*Id.*)

Despite the above-described findings of the ALJ (particularly the findings that Jerome could only occasionally climb, stoop, crouch, kneel, and crawl (AR 18), and that Jerome experienced back pain inhibiting the ability to work (AR 19)), without further meaningful discussion, at step five of the analysis, the ALJ applied Medical-Vocational Rules §§ 202.20-202.22 to determine that Jerome was not disabled. (AR 21.) Additionally, the ALJ found that, considering Jerome's age, education, work experience, and RFC, there were jobs existing in significant numbers in the national economy that Jerome could perform. (*Id.*) In part, this finding was based on the ALJ's decision that Jerome's "additional nonexertional limitations have little or no effect on the occupational base of unskilled light work." (*Id.*)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but

cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To be eligible for disability benefits under the Social Security Act, the claimant must have been insured within the meaning of 42 U.S.C. § 423(c) at the onset date of his or her disability. *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). Thus, no matter how disabled a claimant may be at the time of application for benefits, he or she is not entitled to disability benefits unless he or she became disabled on or before the date last insured ("DLI"). *See Arnone v. Bowen*, 882 F.2d 34, 38 (2d Cir. 1989). Moreover, evidence regarding the claimant's condition subsequent to the DLI is relevant only to the extent that it elucidates the claimant's condition while insured.

In reviewing a Commissioner's disability decision, the court limits its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). A court's factual review of the Commissioner's decision is limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d at 967. "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Poupore v. Astrue*, 566 F.3d 303, 305 (2d Cir. 2009).

In determining whether an ALJ's findings are supported by substantial evidence, the court must consider "the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). Additionally, the court "'must . . . be satisfied that the claimant has had a full hearing under the Commissioner's regulations and in accordance with the beneficent purposes of the [Social Security] Act.'" *Jones v. Apfel*, 66 F. Supp. 2d 518, 522 (S.D.N.Y. 1999) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)). In reviewing the evidence, the court must determine if the ALJ set forth the "crucial factors" justifying his or her findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Willis v. Comm'r of Soc. Sec.*, 2008 WL 795004, at *1; *see also Ferraris v. Heckler*, 728 F.2d at 587.

The reviewing court's role with respect to the Commissioner's disability decisions is "'quite limited[,] and substantial deference is to be afforded the Commissioner's decision.'" *Hernandez v. Barnhart*, No. 05 Civ. 9586, 2007 WL 2710388, at *7 (S.D.N.Y. Sept. 18, 2007) (quoting *Burris v. Chater*, No. 94 Civ. 8049, 1996 WL 148345, at *3 (S.D.N.Y. Apr. 2, 1996)). The court should not substitute its judgment for that of the Commissioner. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998). The Second Circuit explained: "The entire thrust of judicial review under the disability benefits law is to ensure a just and rational result between the government and a claimant, without substituting a court's judgment for that of the Secretary, and to reverse an administrative determination only when it does not rest on adequate findings sustained by

evidence having 'rational probative force.'" *Williams v. Bowen*, 859 F.2d at 258 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. at 230). Therefore, if the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists. *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the fact finder."); *see also DeChirico v. Callahan*, 134 F.3d 1177, 1182-83 (2d Cir. 1998).

Finally, the Social Security Act "must be construed liberally because it is a remedial statute that is intended to include, rather than exclude, potential recipients of benefits." *Jones v. Apfel*, 66 F. Supp. 2d at 522; *Dousewicz v. Harris*, 646 F.2d 771, 773 ("In its deliberations the District Court should consider the fact that the Social Security Act is a remedial statute to be broadly construed and liberally applied.")

## Analysis

Jerome makes four major arguments in his moving brief: (1) the ALJ erred by using the Medical-Vocational Guidelines ("the grids") as a framework for finding that Jerome was not disabled, and for failing to consider the Guidelines that applied once Jerome approached or turned 50; (2) the ALJ improperly applied the treating physician rule; (3) substantial evidence does not support the ALJ's RFC determination; and (4) the ALJ should have taken evidence from a Vocational Expert, given that Jerome could not perform his past relevant work and his nonexertional limitations significantly limited the range of work he could perform.

## I.    Treating Physician Rule

Evaluation of physicians' testimony is governed by the "treating physician rule." As stated in 20 C.F.R. § 404.1527(d)(2), that rule provides that the ALJ must give a treating physician's opinion as to the claimant's disability "controlling weight," so long as that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *See Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

"When other substantial evidence in the record conflicts with the treating physician's opinion, however, that opinion will not be deemed controlling." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). But even when a treating physician's opinion is not given *controlling* weight, the opinion is still entitled to *some* weight, given that such physician "[is] likely to be the medical professional[] most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2).

When the ALJ does not give controlling weight to a treating physician's opinion, he must apply the following factors to determine the weight to give the opinion: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." *Clark v. Comm'r of Soc.*

*Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (citing 20 C.F.R. § 404.1527(d)(2)).  Additionally,

the regulations require that the ALJ must "give good reasons" in the decision for the

weight given to the opinion of a treating source opinion.  20 C.F.R. § 404.1527(d)(2).

Failure to provide "good reasons" for not crediting the opinion of a claimant's treating

physician is a ground for remand.  *Burgess v. Astrue*, 537 F.3d 117, 129-30 (2d Cir.

2008) (citing *Snell v. Apfel*, 177 F.3d at 133; *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir.

1998) (holding that "the Commissioner's failure to provide 'good reasons' for apparently

affording no weight to the opinion of plaintiff's treating physician constituted legal

error")); *see Otts v. Comm'r of Soc. Sec.*, 249 Fed. Appx. 887, 889-90 (2d Cir. 2007)

(stating that courts "do not hesitate to remand a case when the rejection of a treating

physician opinion is not supported by specified reasons") (internal quotations omitted).

    The critical medical records in this case include the treatment notes, reports, and

opinions of Dr. Tanner, Jerome's treating physician.  Dr. Tanner has treated Jerome's

back pain since at least August 1998.  (AR 169.)  Prior to that date, in June 1996 and July

1998, Jerome had MRIs of his spine.  (AR 176, 177.)  Both MRIs revealed "decreased

signal at L5-S1" and "a very tiny central disc herniation."  (AR 169.)  In August 2002,

another MRI of Jerome's lumbar spine revealed "moderate degenerative changes"

involving Jerome's facet joints.  (AR 367.)  Dr. Tanner reported to Jerome that, although

the MRI revealed "normal" discs, "there are degenerative changes (arthritis-type

changes) in the joints between your back bones."  (AR 370.)  In an August 2002

Treatment Note, Dr. Tanner noted that Jerome was having "chronic daily pain," and

assessed "[c]hronic back pain with facet arthropathy."  (AR 371.)  Four years later, in an

August 2006 Progress Note, Dr. Tanner stated that Jerome reported "several weeks if not months of progressively increasing low back discomfort," and was experiencing "[b]ilateral lumbar pain with a rare shooting discomfort down the right leg posteriorly." (AR 213.)  The Doctor assessed Jerome as having an "[e]xacerbation of chronic back pain," and again stated that, although Jerome's 2002 MRI did not show any evidence of disc disease, he "suspect[ed] . . . facet arthropathy."  (*Id.*)  Dr. Tanner further explained his diagnosis in a letter dated November 8, 2007:  "I do not believe it is possible to provide an absolute statement regarding the source of [Jerome's] back pain. . . .  With [that] qualifier[], it is my opinion, within reasonable medical certainty, that Mr. Jerome, who moves and appears much older than his chronologic age, has pain arising from facet arthropathy.  This is a form of degenerative joint disease of the spine."  (AR 376.)

In October 2006, another Progress Note from Dr. Tanner reflects that Jerome was still having low back pain, described by the Doctor as being "chronic . . . with acute exacerbation."  (AR 202.)  In a November 2006 Progress Note, Dr. Tanner opined that it would be "reasonable" for Jerome to "pursue disability for the short-term given his very limited vocational options at this time."  (AR 195.)  The Doctor further stated that "[p]hysical jobs are simply not within [Jerome's] capability at this time because of his back pain."  (AR 195.)  In a Progress Note dated December 19, 2006, Dr. Tanner reported that Jerome's "[c]hronic back pain [was] not well controlled," and that he was able to work only one to two hours before back pain forced him to stop.  (AR 187.)

In a March 2007 Progress Note, Dr. Tanner indicated that although Jerome's pain was under "adequate control with present dose of methadone," he "suspect[ed]" "COPD"

(chronic obstructive pulmonary disease), for which a combivent inhaler was of "limited impact." (AR 344.) A few months later, in a July 2007 Progress Note, Dr. Tanner noted that Jerome's pain control was "slipping[,] with decreasing ability to work, particularly afternoon secondary to increasing back pain." (AR 301.)

After pulmonary function tests were done in September 2007, Dr. Tanner diagnosed Jerome with "[m]oderately severe Obstructive Airway Disease" and a "Moderate Diffusion Defect." (AR 374.) On October 11, 2007, Dr. Tanner saw Jerome in a follow-up appointment regarding Jerome's respiratory status, and noted that Jerome's back pain, although "reasonably well-controlled," continued. (AR 288.) In the "[a]ssessment and pain" section of his Progress Notes, the Doctor opined that Jerome "has a legitimate reason for disability with the combination of his fairly significant COPD and chronic back pain." (*Id.*) Accordingly, on that date, Dr. Tanner prepared a Medical Source Statement, wherein he stated the following opinions (among others) with respect to Jerome's ability to do work-related activities since the year 2006[1]: Jerome can only "occasionally" lift or carry up to 11-12 pounds; he can stand for less than one hour at a time, can sit for one hour at a time but might need to change positions, and can walk for only 20 minutes at a time for as much as two hours per day; he can only "occasionally" reach and engage in push/pull activities, which leads to shortness of breath; he cannot climb stairs, ramps, ladders, or scaffolds; he cannot balance or crawl; he can only "occasionally" stoop, kneel, or crouch; he can never

---

[1] On the line next to the sentence at the end of the Medical Source Statement, which states: "If you have sufficient information to form an opinion within a reasonable degree of medical probability as to past limitations, on what date were the limitations you found above first present," Dr. Tanner wrote: "[illegible] 2006." (AR 325, ¶ X.)

engage in balancing activities since his balance is impaired due to back pain; he can never be exposed to "unprotected heights" or "dust, odors, fumes and pulmonary irritants;" and he can only "occasionally" engage in "moving mechanical parts" or be exposed to "humidity and wetness[,]" "extreme cold[,]" or "extreme heat."  (AR 320-25.)

Despite these extensive medical records, in his decision, the ALJ noted only Dr. Tanner's November 2006 assessment of Jerome and his 2007 Medical Source Statement. Taking these records into consideration, the ALJ stated that Dr. Tanner's medical opinion was "not sufficiently credible," and thus not worthy of "significant weight," because the Doctor "did not provide a vocational analysis of what [Jerome] was able to do" and because he "fail[ed] to relate [Jerome's] limitations to objective medical signs and findings."  (AR 20.)  This logic is flawed for two reasons.  First, the Second Circuit has held that a lack of specific clinical findings in a treating physician's report does not, in and of itself, justify an ALJ's failure to credit the physician's opinion.  *Schaal v. Apfel*, 134 F.3d at 505.  The Court stated: "[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] *sua sponte*."  *Id.* (citing *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996)).  Second, as described above, Dr. Tanner did in fact relate Jerome's limitations to specific, objective medical findings, namely, to the 2002 MRI which revealed facet arthropathy and to the pulmonary function test results which revealed obstructive air disease.  (*See* AR 320, 367, 370-71, 374, 376.)

Nonetheless, instead of relying on the opinion of Jerome's treating physician, Dr. Tanner, the ALJ relied on the opinion of non-treating state agency physician, Dr. Cynthia

Short, which was contained in a Residual Functional Capacity Assessment ("Assessment") dated March 29, 2007. (AR 276-83.) In her March 2007 Assessment, Dr. Short stated that: Jerome could "occasionally" lift or carry up to 20 pounds and could "frequently" lift or carry up to 10 pounds; he could stand or walk for a total of six hours in an eight-hour workday, and could sit for the same period of time; he was able to ambulate, although he "moved stiffly," had "minimal lateral bending," and "note[d] problems walking on uneven ground;" he "cooks meals, does housework, mows the lawn[,] and most days is capable;" and he could walk 200 yards before needing to stop and rest. (AR 277, 281.)

Noteworthy, Dr. Short did not examine Jerome; did not identify a treating physician's report in her Assessment to substantiate her own opinions (AR 282); and did not reference either the 2002 MRI discussed above (AR 367) or Dr. Tanner's opinion that such MRI revealed facet arthropathy (AR 370, 371) in her Assessment. With respect to the latter deficiency, instead of identifying and analyzing the 2002 MRI, Dr. Short identified a much older MRI from August 1998, which she described as revealing a "very tiny central disc herniation." (AR 277.) Further, Dr. Short's March 2007 Assessment was completed months before Jerome underwent the September 2007 pulmonary function test which revealed obstructive air disease (AR 374), and thus Dr. Short was unable to consider those test results in making her opinion.

The Court finds that the ALJ did not provide "good reasons," as required by 20 C.F.R. § 404.1527(d)(2), for essentially rejecting the opinion of treating physician, Dr. Tanner, and for giving "significant weight" to the opinion of non-treating state agency

physician, Dr. Short.  The Second Circuit has stated: "We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and we will continue remanding when we encounter opinions from ALJ[s] that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."  *Halloran v. Barnhart*, 362 F.3d at 33; *see Snell v. Apfel*, 177 F.3d at 133.  Here, as explained above, not only did the ALJ fail to state good reasons for the weight given to Dr. Tanner's opinion, he also failed to state what weight he gave to such opinion.  Moreover, the ALJ decision does not discuss two important deficiencies in Dr. Short's March 2007 Assessment: (1) its failure to mention the 2002 MRI, on which Dr. Tanner relied in diagnosing facet arthropathy; and (2) its completion months before Jerome underwent the September 2007 pulmonary function test which revealed obstructive air disease.  The ALJ's consideration of and findings regarding these issues should have been explicitly stated in the decision.

At oral argument, the Commissioner cited to *Poupore v. Astrue*, 566 F.3d 303 (2d Cir. 2009) in support of the ALJ's decision to afford Dr. Tanner's opinion less than significant weight.  But *Poupore* does not address the issue of an ALJ failing to provide "good reasons" for affording less than significant weight to the opinion of a treating physician, which failure occurred here.  More importantly, this case is distinguishable from *Poupore* on its facts.  In *Poupore*, the Second Circuit affirmed the ALJ's finding that a treating physician's opinion was not entitled to significant weight on the grounds that the treating physician's opinion "was unsupported by any medical evidence" or "any clinical findings made in the course of [the physician's] treatment" of the claimant.  *Id.* at

307.  The court further explained that the treating physician's opinion relied on the claimant's treating orthopedist's evaluation, which evaluation did not in fact support the treating physician's conclusion that the claimant was unable to perform sedentary work. *Id.*  Specifically, the court noted that the claimant's treating orthopedist had "consistently stated in his reports that [the claimant] was not disabled from all work, but rather would be an excellent candidate for vocational rehabilitation, and capable of performing lighter work."  *Id.* at 305.  Here, in contrast, Dr. Tanner's opinion is supported by objective medical evidence, as described above (*see* AR 320, 367, 370-71, 374, 376), and the opinion was clearly based on clinical findings made in the course of Dr. Tanner's own treatment of Jerome, not based on another doctor's treatment of him.

Accordingly, the Court finds that the ALJ committed legal error by failing to accord more weight to the opinion of Jerome's treating physician, Dr. Tanner; failing to provide "good reasons" for according little or no weight to such opinion; and failing to properly weigh the evidence as a whole.  Given these deficiencies, a re-evaluation of the five-step analysis from determination of Jerome's RFC through the fifth step is required. *See Burgess v. Astrue*, 537 F.3d at 130-31 (remand warranted where ALJ failed to give good reasons for not crediting treating physician's opinion that claimant had bulging disc which pinched nerve each time claimant moved; ALJ's conclusion that there was no objective evidence to support treating physician opinion was unsupported by anything other than erroneous statement of orthopedic surgeon testifying as an expert; and MRI report on claimant's spine was objective evidence that supported treating physician's opinion).  On remand, the ALJ should expressly state how much weight is given to the

opinion of Dr. Tanner, and should provide specific reasons for giving that opinion more or less weight than the other medical evidence.

## II. Residual Functional Capacity

Given the ALJ's failure to accord sufficient weight to the opinion of treating physician Dr. Tanner, or to give good reasons for according little or no weight to the opinion, on remand, the ALJ must reconsider what level of work, if any, Jerome is capable of performing. In other words, the ALJ must reconsider, in light of Dr. Tanner's opinion, his or her conclusion that Jerome has the residual functional capacity to perform "light work except [that he] can only occasionally climb ladders, ropes or scaffolds and [c]an only occasionally stoop, crouch, kneel and crawl." (AR 18.) Particularly, the ALJ should consider and discuss, in the context of determining Jerome's RFC, Dr. Tanner's opinions that Jerome is able to lift and carry only up to 11-12 pounds (AR 320), must change positions frequently (AR 321), can reach and push/pull only occasionally (AR 322), can never climb or crawl (AR 323), and can never be exposed to dust, odors, fumes, and pulmonary irritants (AR 324).

In his decision, the ALJ found Jerome's testimony regarding the intensity, persistence, and limiting effects of his symptoms to be not entirely credible. (AR 19.) In so finding, the ALJ noted that, although Jerome claimed difficulty completing tasks and maintaining concentration, he "was able to perform crossword puzzles and cook and perform household chores for significantly [sic] relevant periods of time;" his activities of daily living "include[d] maintaining a house and two outbuildings, visiting his mother in a nursing home, assisting his daughter with schoolwork and sports activities;" and he

"reports not [having] difficulty carrying out self care and social activities."  (AR 20.)

Although this information is relevant to determining Jerome's RFC, "'a claimant need

not prove that he or she is bedridden or completely helpless to be found disabled.'"

*Rogers v. Barnhart*, No. 2:02-CV-38, *13 (D. Vt. Feb. 17, 2006) (quoting *Giles v.*

*Barnhart*, 368 F. Supp. 2d 924, 944 (N.D. Iowa 2005)); *Thomas v. Sullivan*, 876 F.2d

666, 669 (8th Cir. 1989); *see Keller v. Shalala*, 26 F.3d 856, 859 (8th Cir. 1994) (finding

it error to discredit claimant's subjective complaints of pain based on her daily activities

which consisted of watching television, taking care of her dogs, and doing household

chores, which claimant testified she could not do when she was suffering from a

disabling headache); *Forehand v. Barnhart*, 364 F.3d 984, 988 (8th Cir. 2004) ("We have

long stated that to determine whether a claimant has the residual functional capacity

necessary to be able to work we look to whether she has the ability to perform the

requisite physical acts day in and day out, in the sometimes competitive and stressful

conditions in which real people work in the real world.") (internal quotation omitted).

## III.    Medical-Vocational Guidelines

The ALJ further erred in its use of the Medical-Vocational Guidelines ("the

grids") to decide that Jerome was not disabled without first determining, with specific

reference to the record, that Jerome's nonexertional impairments were not significant.  In

determining whether work exists for a claimant, an ALJ may rely on the Guidelines

"'only if [their] evidentiary underpinnings coincide exactly with the evidence of

disability appearing on the record.'"  *Pearson v. Bowen*, 866 F.2d 809, 811 (5th Cir.

1989) (quoting *Lawler v. Heckler*, 761 F.2d 195, 197 (5th Cir. 1985); *see also McCoy v.*

*Schweiker*, 683 F.2d 1138, 1148 (8th Cir. 1982) (grids apply "only in those situations covered by [their] own terms and the provisions of the Guidelines"), *abrogated on other grounds in Forney v. Apfel*, 524 U.S. 266 (1998).  20 C.F.R. § 404.1569 states this policy as follows:

> [W]e do not apply [the medical-vocational guidelines] if one of the findings of fact about the person's vocational factors and residual functional capacity is not the same as the corresponding criterion of a rule.  In these instances, we give full consideration to all relevant facts in accordance with the definitions and discussions under vocational considerations.

Likewise, the Guidelines themselves state: "Where any one of the findings of fact does not coincide with the corresponding criterion of a rule, the rule does not apply in that particular case and, accordingly, does not direct a conclusion of disabled or not disabled." 20 C.F.R. Part 404, Subpart P, Appendix 2 (Guidelines) § 200.00(a).

In this case, as noted above, the ALJ found that Jerome has the RFC to perform light work *with some nonexertional limitations*.  (AR 18.)  The ALJ further found that, because Jerome's nonexertional limitations - including, in the ALJ's determination, an ability to only occasionally climb ladders, ropes, and scaffolds; and only occasionally stoop, crouch, kneel, and crawl - "have little or no effect on the occupational base of unskilled light work," a finding of "not disabled" was appropriate under the framework of the Guidelines.  (AR 21.)

The Guidelines take into account only exertional impairments; therefore, if, as

here, a claimant suffers from nonexertional impairments[2], use of the Guidelines is appropriate only if those impairments "do not significantly diminish the claimant's residual capacity to perform the activities listed in them." *Evans v. Chater*, 84 F.3d 1054, 1056 (8th Cir. 1996); *see Bapp v. Bowen*, 802 F.2d 601, 605-06 (2d Cir. 1986); *Manns v. Shalala*, 888 F. Supp. 470, 483-84 (W.D.N.Y. 1995) ("Even when there is a nonexertional impairment, it is permissible for the ALJ to resort to the grids, provided that the ALJ finds, and the record supports the finding, that the nonexertional impairment does not significantly diminish the claimant's residual functional capacity to perform the full range of activities listed in the grids."). A claimant's work capacity is "'significantly diminished'" if there is an "'additional loss of work capacity . . . that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.'" *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (quoting *Bapp v. Bowen*, 802 F.2d at 606).

Thus, where nonexertional limitations are involved, the ALJ must "go beyond the grid[s]" and "make findings relating to the severity of [the claimant's] nonexertional limitations and the effects of such limitations on [the claimant's] residual functional capacity before making a determination granting or denying benefits." *Munks v. Heckler*, 580 F. Supp. 871, 874-75 (N.D. Ill. 1984) (citing *Cummins v. Schweiker*, 670 F.2d 81, 84

---

[2] Nonexertional limitations are "medically determinable impairments, such as skin impairments, epilepsy, and impairments of vision, hearing or other senses, *postural and manipulative limitations*, and environmental restrictions [that] do not limit physical exertion." 20 C.F.R. § 404.1545(d); *Trimiar v. Sullivan*, 966 F.2d 1326, 1328, fn. 3 (10th Cir. 1992) (emphasis added). Unlike exertional limitations, nonexertional limitations "are present at all times in a claimant's life, whether during exertion or rest." *Gory v. Schweiker*, 712 F.2d 929, 930 (4th Cir. 1983).

(7th Cir. 1982)).  In *Munks v. Heckler*, 580 F. Supp. at 874-75, the district court applied

this rule:

> In the instant case, the ALJ noted plaintiff's nonexertional limitations but failed to make specific findings.  The conclusory statement of the ALJ that "[t]he claimant's nonexertional limitations do not significantly affect his residual functional capacity for unskilled sedentary work..." standing alone, is insufficient.  *Full and detailed findings of fact are essential to the Secretary's decision and are required.*  In the instant case, nonexertional factors such as plaintiff's pain, memory and judgment difficulties have been clearly raised as issues and such factors must be specifically and explicitly considered to substantiate any conclusion of the ALJ relating to the effects of such facts on his residual capacity.  This is so even if the evidence relating to such factors does not support a finding of disability.  Thus, *the failure of the ALJ to make specific findings in support of the conclusion that plaintiff's nonexertional limitations do not affect his functional capacity requires this Court to remand the matter to the ALJ to further develop the record.*

*Id.* (internal citations omitted) (emphasis added).

In this case, as noted above, the ALJ determined that Jerome had nonexertional

limitations regarding his ability to climb ladders, ropes, or scaffolds; and to stoop,

crouch, kneel, and crawl.  (AR 18.)  *See* 20 C.F.R. § 404.1569a(c)(1)(vi).  In addition, the

ALJ found that Jerome experienced "stiff ambulation, back pain that inhibits the ability to

engage in work related activity after only a short time, limited range of motion[,] and

minimal bending."  (AR 19.)  Despite these findings, the ALJ concluded, *without*

*explanation or analysis*, that Jerome's nonexertional limitations did not significantly

diminish Jerome's ability to perform the full range of light work.  (AR 21.)  Given this

determination, the ALJ applied Medical-Vocational Rules 202.20-202.22 to find that

Jerome was "not disabled."  (*Id.*)  On remand, the ALJ shall reconsider this

determination, in light of Dr. Tanner's opinion and any other relevant evidence, and

provide findings in support of his ultimate conclusion regarding the effect Jerome's specific nonexertional limitations have on his RFC.

## IV.    Borderline Age Situation

Additionally, while on remand, the ALJ must consider and make findings regarding Jerome's borderline age situation.  Although the ALJ noted that Jerome was 48 years old on the alleged disability onset date (AR 20), the decision does not mention or evaluate the fact that Jerome was 50 years old when the administrative hearing took place and when the ALJ decision was issued, and more importantly, only approximately one week shy of being 50 years old on the DLI.  Given this borderline age situation,[3] Jerome properly argues in his moving brief that the ALJ should not have mechanically applied the grids, defining Jerome as a "younger individual age 18-49" (AR 20), but rather, should have considered the Medical-Vocational Rules that applied once Jerome approached or turned 50 years old.

The classifications in the grids divide claimants into specific categories according to age, transferability of skills, and residual functional capacity.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 2 (Guidelines).  The grids provide three distinct age categories: (1) under age 50 ("younger person"); (2) age 50-54 ("person closely approaching advanced age"); and (3) age 55 or older ("person of advanced age").  20 C.F.R. § 404.1563(c)-(e).

_____

[3] *See, e.g., Russell v. Comm'r of Soc. Sec.*, 20 F. Supp. 2d 1133, 1136 (W.D. Mich. 1998) (ALJ impermissibly applied age categories in mechanical manner when he failed to place claimant in the category of claimants approaching advanced age, where claimant was only 92 days short of age 50 when ALJ's decision was rendered); *Leyba v. Chater*, 983 F. Supp. 1048, 1051 (D.N.M. 1996) ("Leyba presented a borderline age situation in that he was only three and a half months shy of his fifty-fifth birthday on the date the ALJ issued his decision."); *Davis v. Shalala*, 883 F. Supp. 828, 838 (E.D.N.Y. 1995) ("Davis' situation was borderline.  He was three months shy from his fiftieth birthday on the date he was last insured."); *Hill v. Sullivan*, 769 F. Supp. 467, 471 (W.D.N.Y. 1991) (finding claimant was in a borderline age situation, where he was "only 3 months and 2 days shy of 55 years, or advanced age, at the time of the hearing").

The Guidelines explain how these categories are to be applied in a borderline age situation, i.e. when a claimant's age overlaps between categories, and they state that the Commissioner "will not apply the age categories mechanically in a borderline situation." *Id.* at § 404.1563(b). The Guidelines explain: "If [the claimant is] *within a few days to a few months of reaching an older age category*, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case." *Id.* (emphasis added).

The Social Security Administration has set forth the following two-part test to be used by adjudicators to identify borderline age situations: (1) determine whether the claimant's age is within a few days or a few months of a higher age category; and (2) if so, determine whether using the higher age category would result in a decision of "disabled" instead of "not disabled." *Russell v. Comm'r of Soc. Sec.*, 20 F. Supp. 2d at 1135. If the answer to one or both is "no," a borderline age situation either does not exist or would not affect the outcome, and the ALJ will use the claimant's chronological age. *Id.* If, on the other hand, the answer to both is "yes," a borderline age situation exists and the adjudicator must decide whether it is more appropriate to use the higher age or the claimant's chronological age. *Id.*

In this case, the ALJ does not appear to have applied the two-part test at all. Instead, the ALJ mechanically applied the "younger person" age category to Jerome. In *Ford v. Heckler*, 572 F. Supp. 992, 994 (E.D.N.C. 1983), the court remanded a case because the ALJ failed to consider that the claimant was three months shy of the next age

group on the grids at the time the ALJ made his ruling, and just 15 days shy of this age

when the Appeals Council rejected his claim.  The court concluded that the "troublesome

problem" was the ALJ's "rote application of the regulations." *Id.*  As stated above, the

"rules require that an ALJ not apply the age categories mechanically in a borderline

situation." *Gory v. Schweiker*, 712 F.2d at 930-31 (citing 20 C.F.R. § 404.1563(a)).  In

*Hanks v. Astrue*, No. 07-cv-00788, 2008 WL 4059877, *4 (D. Colo. Aug. 29, 2008), the

court remanded a case based on the ALJ's failure to consider the claimant to be in a

borderline age situation, where the claimant was approximately three months short of

being "closely approaching advanced age" at her DLI.  Likewise, in *Chester v. Heckler*,

610 F. Supp. 533, 535 (D.C. Fla. 1985), the court remanded a case based on the ALJ's

mechanical application of the age factor of the grids to determine that the claimant did

not become disabled until he turned 50, one month after the DLI.  The court stated:

> In the instant case, the plaintiff was 49 years, 11 months, at the time his
> insured status ran out.  The Appeals Council, *without even discussing
> plaintiff's borderline age situation*, determined that plaintiff was disabled
> the day he turned 50.  Clearly, this can only be seen as a mechanical
> application of the age factor of the Grid which works a special hardship on
> the plaintiff whose insurance expired.  For that reason, the decision of the
> Secretary, which contravens her own regulations, must be reversed.  The
> cause should be remanded for an individualized determination of the age
> factor and for proper consideration of the plaintiff's borderline status.

*Id.* (emphasis added); *see also Schiel v. Comm'r of Soc. Sec.*, 267 Fed. Appx. 660, 661

(9th Cir. 2008) (ALJ required to consider application of older age category in

determining whether claimant, who was 54 and 11 months old on the DLI, was entitled to

disability insurance benefits).  Although some courts have interpreted the regulations to

extend the borderline age period beyond six months, this Court has previously stated that

"the period should be no more than six months from the next higher age category."
*Duval v. Barnhart*, No. 1:05-CV-254, at *10 (D. Vt. June 22, 2006).

Jerome was born on October 7, 1957 (AR 34, 108), and thus turned 50 years old on October 7, 2007, approximately one week after his DLI, September 30, 2007. Jerome's administrative hearing occurred approximately one month after his 50th birthday, on November 8, 2007 (AR 23), and the ALJ's decision was issued three weeks later, on November 29, 2007 (AR 22). Therefore, Jerome was 50 years old on both the date of his administrative hearing and the date of issuance of the ALJ decision; and more importantly, he was only approximately one week shy of 50 on his DLI (i.e., easily "within a few days to a few months of reaching an older age category," as required by 20 C.F.R. § 404.1563(b)). Moreover, Jerome's treating physician, Dr. Tanner, opined that Jerome "moves and appears much older than his chronological age." (AR 376.) The ALJ failed to sufficiently address the affect of Jerome's age, particularly on the date of his DLI, on his placement in the grids. The ALJ also failed to address the fact that, as of the date of the administrative hearing, Jerome was in fact 50 years old.

The ALJ's mechanical approach to applying the "younger person" age category to Jerome, without even discussing Jerome's borderline age situation, is not supported by substantial evidence. It is not the province of the court to determine whether or not to consider a borderline age situation. *Carter v. Barnhart*, 2003 WL 22749253, *7 (N.D. Cal. Nov. 14, 2003). "Borderline situations are considered in light of evaluating the overall impact of all the factors of claimant's case. Factual findings and considerations are within the sound discretion of the ALJ, and th[e] Court will defer to such findings."

*Id.* (internal quotation omitted). Thus, on remand, if the ALJ determines that it is proper to use the grids in deciding whether Jerome meets the Social Security Act's definition of "disabled" (see above section), the ALJ shall consider and make findings regarding whether Jerome qualifies as a "borderline" claimant, and whether his RFC should be evaluated using the category of "person closely approaching advanced age," as opposed to "younger person."

## V.      Vocational Expert

If, on remand, the ALJ gives controlling weight to Dr. Tanner's opinion regarding Jerome's sit/stand limitations (i.e., that Jerome must change positions frequently and is unable to sit or stand for longer than one hour at a time), a vocational expert shall be utilized to assist in determining Jerome's RFC. The Seventh Circuit has held: "[I]n the case of an applicant for disability benefits who cannot sit or stand indefinitely, a vocational expert, vocational dictionary, or other appropriate guide or source must be consulted to determine whether there are sufficient jobs in the national economy that the applicant is physically capable of holding to justify a conclusion that he is not disabled." *Peterson v. Chater*, 96 F.3d 1015, 1016 (7th Cir. 1996) (citing SSR 83-12). The court continued: "[T]he Social Security Administration has determined that an individual who 'may be able to sit for a time, but must then get up and stand or walk for awhile . . . before returning to sitting . . . is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work . . . or the prolonged standing or walking contemplated for most light work.'" *Id.*

Additionally, if, on remand, the ALJ finds that Jerome's nonexertional limitations may have significantly diminished his work capacity, the ALJ shall utilize a vocational expert in determining Jerome's ability to perform "any other work." Although "the mere existence of a nonexertional impairment does not automatically require the production of a vocational expert," *Bapp v. Bowen*, 802 F.2d at 603, it is widely held that, "where the claimant's nonexertional impairments . . . significantly diminish his capacity to perform the full range of activities listed in the grids, the Secretary must produce expert vocational testimony or other similar evidence to establish that there are jobs available in the national economy for a person with claimant's characteristics," *Manns v. Shalala*, 888 F. Supp. at 484 (citations omitted).

## Conclusion

The ALJ should have given greater weight to the opinion of treating physician Dr. Tanner, or at a minimum, stated specifically why no weight or only minimal weight was given to such opinion. Moreover, given the ALJ's determination that Jerome suffered from several nonexertional limitations, including a limited ability to climb, crouch, and crawl; the ALJ was required to make a specific finding with respect to whether and why (or why not) these limitations significantly diminished Jerome's residual functional capacity to perform the full range of activities listed in the grids, before relying on the grids to determine whether Jerome was disabled or not disabled. Furthermore, the ALJ erred in mechanically applying the "younger person" age category in the grids to Jerome, when Jerome was only approximately one week shy of 50 on his DLI, and was 50 years old on both the date of his administrative hearing and the date of issuance of the ALJ

decision.  Finally, the ALJ should have employed a vocational expert to assist in determining Jerome's ability to perform "any other work," and perhaps also to assist in determining Jerome's RFC.

For these reasons, Jerome's Motion for an order reversing the Commissioner's decision (Doc. 13) is GRANTED, the Motion of the Commissioner (Doc. 14) is DENIED, and the matter is REMANDED pursuant to 42 U.S.C. § 405(g) for proper application of the treating physician rule and of the Medical-Vocational Guidelines, and to obtain the testimony of a vocational expert, if necessary.

Dated at Burlington, in the District of Vermont, this 6th day of November, 2009.


/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge